# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | **Case No. 10-00161-TLM** |
| **LARAYE L. O'BRIEN** ) | |
| ) | |
| ) | **Chapter 7** |
| Debtor. ) | |
| _____ ) | |
| ) | |
| **BOISE CITY/ADA COUNTY** ) | |
| **HOUSING AUTHORITY,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Adversary No. 10-06031-TLM** |
| v. ) | |
| ) | |
| **LARAYE L. O'BRIEN,** ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION
_____

**INTRODUCTION**

The Boise City/Ada County Housing Authority ("Plaintiff") filed this adversary proceeding seeking a judgment that a debt is owed to it by chapter 7 debtor LaRaye O'Brien ("Defendant"), and that the same is nondischargeable under § 523(a)(2)(A).[1]  The matter came on for trial on July 1, 2011.  After considering the evidence and the controlling law, the Court concludes judgment

---

[1] All statutory citations are to the Bankruptcy Code, Title 11, U.S. Code, §§ 101-1532, unless expressly noted otherwise.

MEMORANDUM OF DECISION - 1

will be entered in favor of Plaintiff. The following constitutes the Court's findings of fact and conclusions of law. *See* Fed. R. Bankr. P. 7052.

**BACKGROUND AND FACTS**

The parties agree to the majority of the relevant facts. *See* Adv. Doc. No. 68. Plaintiff is a public housing agency ("PHA") authorized by the United States Department of Housing and Urban Development ("HUD") to administer and provide what is known as "Section 8" housing assistance. Defendant was the owner of rental property at 7105 Snohomish in Boise, Idaho.[2]

In 2001, Defendant rented 7105 Snohomish to an individual under a one-year lease for $875.00 per month. *See* Ex. 110. In early 2003, she rented the same property to another tenant for $750.00 per month. *See* Ex. 111. Defendant leased the property at the lesser amount because rentals "had dropped a little bit," because she knew the tenant and because the lease would be short term.

In late 2003, Defendant's rental property was again vacant. Defendant's daughter-in-law, Jennifer O'Brien, was a previously approved recipient of Section 8 housing assistance, and she and her family were looking for a new place to live. Defendant testified at her initial § 341(a) meeting of creditors that her son, Jeremiah O'Brien, approached her regarding her vacant rental property, but at the trial she asserted her daughter-in-law initiated the conversations. Under either

---

[2] This property is a unit in a duplex; Defendant lived in the other unit.

MEMORANDUM OF DECISION - 2

scenario, Defendant agreed to lease her property to her family.  However, in order to receive Section 8 assistance payments, Defendant – as the owner of the real property Jennifer and Jeremiah wanted to rent for themselves and their children – had to certify that she was "not the parent, child, grandparent, grandchild, sister or brother of any member of the [tenant] family."  Defendant signed a Request for Tenancy Approval containing this certification.  Ex. 101.

Upon processing the Request for Tenancy Approval, a housing representative, Veronica Roby, initiated two telephone conversations with Defendant.  While Defendant testified that she did not remember speaking with a woman from the Housing Authority, the Court finds Ms. Roby's testimony, supported by her handwritten notes on the Request for Tenancy Approval, to be credible.

In the initial conversation, Ms. Roby verified the information provided in the Request for Tenancy Approval.  In that process, the fact that Defendant's last name matched that of the prospective tenant family raised a red flag and Ms. Roby, in accord with Plaintiff's procedures, asked Defendant if she was related to the tenant or the client.  Defendant informed Ms. Roby that she was not related to the tenant or the client.  *See* Ex. 101.  Ms. Roby noted the information in the file and no further inquiries were made at that time.

The Request for Tenancy Approval was ultimately approved in August, 2003, and Plaintiff sent Defendant a Housing Assistance Payment Contract ("HAP

MEMORANDUM OF DECISION - 3

Contract") that contained similar certifications or representations regarding the lack of a familial relationship with her tenants. *See* Ex. 100. Defendant signed the HAP Contract. *Id.* at 2.

Plaintiff thereafter made payments to Defendant until April 2009. In 2009, Plaintiff reviewed the rental file of Jennifer O'Brien due to possible compliance issues with the tenant family, initially unrelated to the familial connection issue. In that review, Plaintiff's Executive Director noted that Defendant and the tenant family shared the same surname. At that point, already having concerns over the accuracy of the disclosures in the file and the compliance with Plaintiff's regulations, another employee of Plaintiff, Katie Kilgrow, was asked to investigate the issue further. Ms. Kilgrow ordered a birth-certificate and determined Defendant was Jeremiah's mother.

Upon learning of the relationship between Defendant and the tenant family, Plaintiff terminated the HAP Contract and initiated suit in state court against Defendant seeking to recover what it alleged were fraudulently obtained housing benefits and claiming damages in the amount of $48,980.17 – the total amount paid to Defendant under the HAP Contract. Defendant's bankruptcy filing stayed Plaintiff's state court litigation to establish and collect that claim.

**DISCUSSION AND DISPOSITION**

Section 523(a)(2)(A) allows the Court to render a judgment holding nondischargeable a debt for money "to the extent obtained by false pretenses, a

MEMORANDUM OF DECISION - 4

false representation, or actual fraud." This Court held in *Fetty v. D.L. Carlson Enters., Inc. (In re Carlson)*, 426 B.R. 840 (Bankr. D. Idaho 2010):

> A cause of action under § 523(a)(2)(A) requires proof of several elements. Plaintiff must prove by a preponderance of the evidence (1) misrepresentation, fraudulent omission, or deceptive conduct by the debtor in obtaining money, property, services or credit; (2) debtor's knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by such statement or conduct.

*Id.* at 854. If the Court finds all the elements were met by a preponderance of the evidence, it also has the authority to enter a money judgment in this dischargeability proceeding. *See Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017-18 (9th Cir. 1997); *King v. Lough (In re Lough)*, 422 B.R. 727, 732-33 (Bankr. D. Idaho 2010).

### 1. Representations

Plaintiff points to several misrepresentations made by Defendant. The Court finds at least four were proven.

Defendant signed the Request for Tenancy Approval form which contained, under "Owner's Certifications" the following statement:

> The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

MEMORANDUM OF DECISION - 5

*See* Ex. 101. Defendant signed the form containing that representation, and she did not disclose that she was the mother of Jeremiah or the grandmother to a child within the tenant family.[3]

Moreover, Defendant further verbally represented, when asked directly by Ms. Roby in a telephone conversation while Ms. Roby was verifying information within the Request for Tenancy Approval, that she was not related to the tenant or client.

Also under "Owner's Certifications," Defendant was asked to provide the "most recently leased comparable unassisted units within the premises or elsewhere." Defendant listed a December 2001 rental of the 7105 W. Snohomish unit for $865.00 per month. She did not disclose the "most recent" lease of the property in 2003 at $750.00 per month.

Defendant then signed a HAP Contract which contained similar owner certifications. *See* Ex. 100, part B at p.3. Defendant, as owner again certified that she was "not the parent, child, grandparent, grandchild, sister, or brother of any member of the family." The HAP Contract defined "family" as "[t]he persons who may reside in the unit with assistance under the program." Ex. 100, part C at p.8.

---

[3] The parties stipulate that Defendant is "the grandparent of two children of Jeremiah and Jennifer O'Brien." *See* Adv. Doc. No. 68 at 2. While it is unclear if both those children existed in 2003 when this representation was made, *see* Ex. 100, it is clear that Defendant was the grandparent of at least one child within the tenant family at that time.

MEMORANDUM OF DECISION - 6

### 2. Falsity, Knowledge and Intent

Plaintiff must also prove that Defendant made these representations knowing they were false and with the actual intent to deceive Plaintiff.  Plaintiff may prove knowledge and fraudulent intent through circumstantial evidence based on the Defendant's own course of conduct since direct evidence is rarely present. *See Cowen*, 108 F.3d at 1018; *Fetty*, 426 B.R. at 855.  A person acts knowingly if she acts deliberately and consciously.  *See Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 883-84 (9th Cir. BAP 2005) (citing Black's Law Dictionary 888 (8th ed. 2004), in the context of § 727(a)(4)(A)'s element of knowledge).  Here, the Court concludes Defendant made the representations in the Request for Tenancy Approval (regarding a lack of familial connections and the most recent rental charge) and the verbal representation to Ms. Roby deliberately and consciously with an intent to deceive.[4]

Defendant testified she signed the Request for Tenancy Approval where Jennifer, her daughter-in-law, told her to sign.  The implication from her testimony, although not directly stated, is that she did not read the form but merely

---

[4] As noted, Defendant also made representations in the HAP Contract.  However, the HAP Contract consists of three parts.  While Defendant signed Part A of the HAP Contract and the Court believes she read the same, the representation regarding a lack of a familial relationship is found within Part B and the relevant definition of family is found within Part C.  Part B and Part C contain several pages of provisions, which the Court believes Defendant did not read.  Thus, the Court concludes Defendant did not have the requisite knowledge of the content found within those parts of the HAP Contract and this Court's ruling of nondischargeability is not based on the representation within the HAP Contract.

MEMORANDUM OF DECISION - 7

signed where she was told. She thus asserts she could have no knowledge of the falsity of the certification nor the requisite fraudulent intent.

However, section 12 of the form entitled "Owner's Certifications" required Defendant to not just sign the document, but to provide information to Plaintiff. Defendant completed section 12. Defendant filled in the amount charged for her "most recently leased" unit in the Owner's Certification section. The information Defendant inserted into the Request for Tenancy Approval form was directly above the express certification that she was not related to the family. The Court finds, despite Defendant's protests, that she was aware of the information and certifications in that section.

Moreover, other information Defendant provided was false. Her most recently leased unit, 7105 Snohomish, was leased to tenants for $750.00 per month, not $865.00 per month as she provided. Defendant did not provide any credible reason why she excluded her most recent rental amount from the form. The Court concludes Defendant listed the higher, prior rental rate in order to justify the amount she was "charging" her family and maximize the amount of Section 8 assistance payments she would receive.

Finally, the Court notes that it found Defendant to be an intelligent, educated woman who has completed several years of college. While she was not employed in her current job when the events at issue occurred, over the last six years she has maintained a job in which she must read, edit and distribute complex

MEMORANDUM OF DECISION - 8

written materials regarding the operations of her employer. The Court concludes she had the ability to understand the "Owner Certifications" found within the Request for Tenancy Approval.

The Court concludes Defendant was aware of and understood the certification language – as to rental rate and lack of a familial relationship – and she signed her name knowing that her representations were false. She knew she was related to the family since she was Jeremiah's mother. Moreover, she made the representations with the intent of deceiving Plaintiff and in order to obtain the housing assistance payments.[5]

In addition, the Court finds Defendant made knowingly false verbal representations to Plaintiff regarding a lack of a familial relationship with the tenant. Defendant testified that she did not recall having a conversation with Ms. Roby, however, as noted above, the Court finds the conversation occurred. Ms. Roby credibly testified that she spoke with the Defendant and made notes on the Request for Tenancy Approval stating "Per PC [phone call] Not Related to Tenant" with a line drawn by Ms. Roby from that comment to Defendant's name to indicate she had asked Defendant if she was related to the tenant and Defendant

---

[5] Defendant's counsel argues that the certification had a condition or exception that would allow family members to be landlords in the case of "disability" and with housing authority approval, and that Defendant did not and could not know if the condition or exception applied (and particularly whether there was or would be housing authority approval) at the time she signed. Counsel therefore argues that Defendant's certification, without knowledge of whether the provision was met, could not be knowingly false or provided with the intent to deceive. The Court finds this argument strained and unpersuasive.

MEMORANDUM OF DECISION - 9

answered that she was not.

While Defendant says she cannot recall any such conversation, her counsel sallies a different argument. He attempts to give a meaning to Defendant's statement to Ms. Roby that would negate any knowledge of falsity or intent to deceive, arguing that *Jennifer* O'Brien was the tenant and, therefore, when Defendant was asked if she was related to the tenant, she answered truthfully – as to Jennifer – because she could have interpreted the question to mean related by blood (consanguinity) as opposed to related through marriage (affinity). Such a theory is counterintuitive.[6] More importantly, it is not supported by testimony. Defendant did not provide any such interpretation of the question, because she testified that she did not recall the conversation ever occurring. Nor did Defendant testify as to her understanding, generally or specifically, of what the term "related" meant.

Instead, the Court concludes, Defendant answered Ms. Roby's question in the negative because, although she knew she was related to the family, she wanted to collect the housing assistance payments and be assured of the subsidized rental income, and she knew that she could not do so if she was found to be related to Jennifer or the members of the tenant family.

---

[6] A normal reaction to the question would be to say, "Yes, I'm 'related to' Jennifer; she's my daughter-in-law." Even if the hyper-technical interpretation suggested by counsel was really Defendant's, a likely response would be to say "Well, I'm not 'related' to Jennifer; she is only my daughter-in-law. Is that a problem?" or to volunteer and explain in some fashion that Defendant was related to Jennifer's husband and to the grandchildren.

MEMORANDUM OF DECISION - 10

### 3. Justifiable Reliance

Plaintiff must prove that it justifiably relied upon Defendant's false representations. *See Field v. Mans,* 516 U.S. 59, 74-75 (1995) (determining § 523(a)(2)(A) requires justifiable reliance as opposed to reasonable reliance). Justifiable reliance looks to the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71 (quoting Restatement (Second) of Torts § 545A cmt. b (1976)). There is no duty to investigate under a justifiable reliance standard unless "the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived." *Id.* at 71-72 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).

Here, Ms. Kilgrow testified that Plaintiff routinely relies upon the completed HUD forms without any investigation unless a red flag is raised. Only then would a housing representative make an inquiry of the prospective landlord or tenant to confirm or clarify any inconsistency. Plaintiff proved that it followed its own internal procedures and, upon seeing that the Defendant and the tenant family shared the same last name, inquired to see if they were related. Upon receiving Defendant's affirmative denial, Plaintiff noted that answer in its records and continued to process the Request for Tenancy Approval.

Defendant argues that Plaintiff could not have justifiably relied because the

MEMORANDUM OF DECISION - 11

fact that the parties were related was apparent from even a cursory glance at the documents which revealed Defendant and her prospective tenants shared the same surname. Defendant in essence argues it is not justifiable to take the word of a prospective landlord or Section 8 participant denying a relationship if those individuals share the same last name, and that Defendant was required to conduct a more extensive investigation, such as ordering a birth certificate or searching other public records. However, a party who perpetrates a fraud and induces a party to act based on misrepresentations cannot defeat a claim for damages by asserting the defrauded party might have discovered the fraud by exercising further investigation. *Id.* at 72 (citing 2 F. Harper, F. James & O. Gary, Law of Torts § 7.12, pp. 455-58 (2d ed. 1986)).

It is true that Plaintiff could not ignore an obvious misrepresentation. But merely sharing a surname does not make the misrepresentation obvious. Plaintiff established it made further inquiries when the question was raised – *i.e.*, Ms. Roby's inquiry – and upon receiving Defendant's oral representation regarding a lack of a familial relationship, took that representation at face value. Plaintiff's approach was in compliance with its procedures. Defendant's verbal answer, denying she was related to the tenant, resolved the issue raised by the same surname, and did not raise any new or further issues requiring investigation. *See Capp Equities, LLC v. Christine (In re Christine)*, 429 B.R. 882, 887-88 (Bankr. W.D. Mich. 2010) (finding that even though the creditor knew of potential

MEMORANDUM OF DECISION - 12

problems with a building he purchased, the debtor provided plausible explanations that answered creditor's questions and assuaged his concerns prior to closing and, thus, reliance was justifiable). Nothing in the evidence regarding the parties' interactions establishes a reason why Plaintiff would have cause to mistrust Defendant.[7] Plaintiff here justifiably relied on Defendant's factual representation.[8]

### 4. Damages

Plaintiff proved it disbursed $48,980.17 to Defendant, and that it would not have done so absent Defendant's false representation that she was not related to her prospective tenant. *See* Ex. 115 (payment history). This establishes a specific amount of proximately caused damages. Defendant argues, though, that the funds distributed were federal funds and thus Plaintiff, as a local quasi-governmental entity, was not damaged.[9]

---

[7] This is in contrast to the situation in 2009, when other circumstances regarding compliance with Plaintiff's regulations caused Plaintiff to have a heightened suspicion or concern and investigate further.

[8] Similarly, Defendant's statute of limitations defense must fail. The statute of limitations in a fraud case begins to run upon "the discovery, by the aggrieved party, of the facts constituting the fraud." Idaho Code § 5-218(4). While Defendant argues the statute of limitations began to run when Defendant signed the Request for Tenancy Approval and Plaintiff could have, and should have, performed a search of the public records given the common surname on the form, the Court concludes Plaintiff had no obligation or duty to perform such a search. The cause of action did not arise until Plaintiff discovered in 2009 that Defendant and the tenant were related.

[9] Defendant also argues that because Jennifer O'Brien was approved under the Section 8 program and Plaintiff would have distributed assistance payments to some other owner/landlord for Jennifer's benefit, Plaintiff was not damaged in making those payments to Defendant. Defendant also argues the converse, that Defendant and her property were approved by Plaintiff and the rental charge was deemed reasonable, thus Plaintiff would have paid Defendant as an

(continued...)

MEMORANDUM OF DECISION - 13

Plaintiff is a contract administrator under an annual contribution contract with HUD in which it agreed to administer its housing assistance programs in compliance with HUD requirements. 24 CFR § 982.52. Plaintiff applies to HUD for funding and HUD regulates Plaintiff's use of those funds. 24 CFR §§ 982.103 and 982.52. But once the funds are received, it is Plaintiff who decides how and to whom to distribute them in compliance with its regulations. Plaintiff is the party that screens prospective participants and enters into HAP Contracts with owners. And Plaintiff is the entity with the right to recover overpayments, abate, reduce or terminate housing assistance payments or terminate the HAP Contract. *See* 24 CFR § 982.453.[10] In short, Plaintiff not only has the authority but is encouraged to initiate lawsuits to recover, from Section 8 tenants and/or owners, payments of Section 8 funds that were distributed in violation of Section 8 regulations. *See* 24 CFR §§ 792.101 - 792.204.[11] The Court finds Plaintiff has

---

[9](...continued)
owner if renting to some other Section 8 voucher holder. The point, however, is that Plaintiff would not have made the payments to Defendant in this case absent her fraudulent misrepresentation. That Plaintiff may have spent money elsewhere to assist Jennifer O'Brien and her family, or assisted a different tenant leasing from Defendant, is not relevant.

[10] 24 CFR 982.453(b) states:

(b) The PHA rights and remedies against the owner under the HAP contract include recovery of overpayments, abatement or other reduction of housing assistance payments, termination of house assistance payments, and termination of the HAP contract.

[11] That Plaintiff might return some of the recovered funds to HUD or to the benefit of third parties under its controlling regulations does not mean that it was not damaged or that it lacks the ability to seek to collect such funds in the first instance.

MEMORANDUM OF DECISION - 14

adequately proven its proximately caused damages.

**CONCLUSION**

The Court concludes Plaintiff has proven by a preponderance of the evidence all the elements of § 523(a)(2)(A). Debtor's debt to Plaintiff of $48,980.17 is nondischargeable in her chapter 7 bankruptcy. Plaintiff may submit a form of Judgment consistent with this Decision.

DATED: August 10, 2011

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 15